IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOHN DOE, | ) CASE NO.: |
| | ) |
| Plaintiff, | ) JUDGE: |
| | ) |
| v. | ) |
| | ) |
| KENYON COLLEGE, | ) **VERIFIED COMPLAINT** |
| | ) |
| and | ) **(Jury Trial Demanded)** |
| | ) |
| JANE ROE, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## CIVIL ACTION COMPLAINT

Plaintiff John Doe ("John"), by and through undersigned counsel, files this Complaint against Kenyon College ("Kenyon") and Jane Roe ("Jane") in support thereof, and alleges as follows:

### NATURE OF THIS ACTION

1. Jane falsely accused John of sexual misconduct in violation of Kenyon's Title IX and Intimate Partner Violence Policy ("Title IX Policy")(attached hereto as Exhibit A).

2. Jane's false allegations relate to acts that John allegedly committed on November 12, 2017.

3. Approximately five months later, on April 12, 2018, Jane filed a complaint against John.

4. Kenyon issued a No Contact Order without speaking to John to determine whether there was any cause for the concern for the safety of Jane.

5.     In response to Jane's complaint, Kenyon began an investigation, which remains ongoing.

6.     On April 23, 2018, Kenyon investigators interviewed John regarding Jane's complaint.

7.     Kenyon first communicated to John that their findings would be presented no later than May 15, 2018.

8.     On Tuesday, May 8, 2018, John received from Kenyon notice that Jane Roe 2 filed a report alleging that on or about February 3, 2017, John made unwanted sexual comments to her and put his hand around her neck.  Although she filed a report, Jane Roe 2 clearly expressed to Kenyon that she did not want the school to investigate her claim.

9.     Jane Roe 2 requested a No Contact Order be issued to keep John away from her, and Kenyon issued a No Contact Order without talking to John.

10.     Despite Jane Roe 2's desire for Kenyon not to conduct an investigation, Kenyon nonetheless proceeded to conduct a full investigation of her report to determine whether her report constituted pattern evidence to be included in the investigation of Jane's complaint.

11.     Based on the additional information received from Jane Roe 2, Kenyon advised John that its investigation of Jane's complaint would take longer than expected.

12.     On May 11, 2018, after communicating with John's counsel and learning of John's intent to seek injunctive relief if he is not permitted to graduate, Kenyon informed John that the findings of the investigation will not be available until sometime on May 18, 2018—the very eve of graduation (see Kenyon's working timeline for Title IX investigation received and email communicating same attached hereto as Exhibit B).

2

13.     On May 18, 2018, if Kenyon finds that John engaged in prohibited conduct in violation of the Title IX Policy, John will not be able to avail himself to an appeal prior to his graduation date.

14.     Kenyon's decision to change the timeline for the investigation was an intentional, punitive, and malicious act that was merely a pretext to prevent John from being able to timely file an action for injunctive relief.

15.     The actions of Jane have caused damages to John in the form of intentional infliction of emotional distress and defamation.

16.     The actions of Kenyon have left John no other option but to seek damages, declaratory relief and injunctive relief to remedy emotional, mental and economic harm caused by Kenyon. John's causes of action against Kenyon include: breach of contract and violations of Title IX of the Educational Amendments of 1972 / 20 U.S.C. § 1681.

17.     Kenyon has violated Title IX by creating a gender biased hostile environment against males, like John, based in part of Kenyon's pattern and practice of disciplining male students who are victims of false allegations.

18.     Kenyon has also violated policies and procedures as outlined in its official publications, including, but not limited to, the Student Handbook, the Title IX Policy, and other relevant policies not specifically mentioned in the Complaint by improperly and unlawfully applying and/or breaching the policies.

19.     In continuing its investigation against John, Kenyon ignored or dismissed evidence which established that Jane was not truthful with investigators in her allegations against John. This evidence included, but was not limited to:

a.  Jane's statement that she was "more upset than she had ever been because she learned that an emotionally abuse boyfriend was leaving Kenyon;

b.  Jane admitted that she suffers from depression and was diagnosed via Skype with schizophrenia;

c.  Jane could provide no reasonable explanation why she did not simply leave the premises if she did not feel comfortable;

d.  Jane admitted to hearing voices and hallucinating "patterns of the wall";

e.  Jane admitted returning to John's apartment after the alleged incident, but could provide no reasonable explanation for that action;

f.  Jane denied being asked to leave John's apartment, but multiple witnesses stated that she was asked to leave numerous times;

g.  Jane referred to John as "weird" and a "sleazy weirdo," but incredibly told the investigator that she wanted to "hook up" with him and was upset that another female witness was trying to block her from "hooking up" with John;

h.  Jane proceeded to go upstairs with John despite claiming that John choked her on the first floor of the apartment;

i.  John consistently stated that he left the party with M.F. and that he had no interest in Jane;

j.  John stated that Jane repeatedly called him "weird", a word she repeated again and again to the investigator;

k.  John explained to the investigator that Jane walked in to the bathroom in his apartment while he was urinating and refused to leave (a violation of Kenyon Policies);

4

l.  M.F. explained to the investigator that she had not met John prior to the night in question and explained that she left the party with John and it was Jane who followed them;

m.  M.F. explained that she believed that Jane wanted to be with John and that Jane was annoyed that M.F. was present;

n.  M.F. explained that she was with John for the entire night and, other than an approximate two-minute period, Jane was never alone with John;

o.  N.P. confirmed that Jane was acting aggressive, calling John and others weird, and that Jane was asked to leave more than once;

p.  R.S. stated that when he arrived at John's apartment, John immediately asked for assistance with getting Jane to leave the apartment;

q.  Both R.S. and John asked Jane to leave; and

r.  Jane told S.G. the day after the alleged events that John choked her in a bathroom at John's apartment, but Jane told Kenyon's investigators that John choked her on the first floor of the apartment in plain view.

20.  Kenyon's legitimate goal of preventing sexual misconduct is not the issue in, nor is it the basis for this Complaint. Rather, this Complaint addresses how Kenyon's unlawful actions towards John were motivated by the anti-male gender bias detailed herein.

## THE PARTIES, VENUE, AND JURISDICTION

21.  John is a male residing in Connecticut.

22.  Jane attends Kenyon College. Upon information and belief, Jane resides in New Jersey.

23.     Kenyon, upon information and belief, is an Ohio corporation with its principal place of business in Gambier, Ohio.

24.     This action arises under Ohio common law and under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq*.

25.     This Court has jurisdiction over this action by virtue of federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the claims herein arise under the laws of the United States of America.

26.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) for any non-federal claims alleged herein.

27.     This Court has personal jurisdiction over Defendants because they reside and/or conduct business in Ohio.

28.     This Court has jurisdiction over this matter because John is a resident of the State of New York and there is complete diversity between the parties pursuant to 28 U.S.C. § 1332.

29.     Venue rests with this Court pursuant to 28 U.S.C § 1391 because all of the events or omissions giving rise to John's claims occurred in Gambier, Ohio.

### John's Encounter With Jane

30.     The evening of November 11, 2017, prior to meeting John, Jane attended a party where she drank at least three alcoholic drinks.

31.     After leaving that party, Jane went to another party at DKE Bullseye and consumed approximately one to two beers.

32.     Jane was upset that evening because she had broken up with an abusive boyfriend and had seen her ex-boyfriend's Facebook post in which he stated that he was considering dropping out of Kenyon.

33.   Jane decided to "hook up" with someone because she was upset about her ex-boyfriend.

34.   Jane met John at the party.

35.   Jane told the investigators that John was "weird" and made her "uncomfortable," but she voluntarily stayed with him and the accompanied him and M.F. to John's apartment.

36.   Jane's friends left her because they believed she wanted to "hook up" with John.

37.   In the early morning hours of November 12, 2017, John met M.F. for the first time.

38.   John invited M.F. to accompany him back to his apartment.

39.   When M.F. and John left, Jane "tagged along."

40.   During the walk back to the apartment, Jane was aggressive and combative, repeatedly calling John weird.

41.   Despite her insults to John, Jane continued to accompany John and M.F.

42.   John was walking with M.F. and it was apparent that the two of them were interested in one another, but Jane continued to accompany them.

43.   After arriving at John's apartment, Jane went into the bathroom on the first floor.

44.   At all times relevant to this matter, M.F. remained present in John's apartment.

45.   John went upstairs to use the bathroom.

46.   John closed the bathroom door, but Jane opened the door—without knocking—and walked into the bathroom while John was urinating.

47.   John immediately asked Jane to leave the bathroom, but she ignored his request.

48.   Jane walked toward the shower area because that allowed her to see John's penis as he was urinating.

49.     John commanded Jane to leave the bathroom at least three to four times, but she did not comply.

50.     John and Jane were alone together in the bathroom for no more than two to three minutes.

51.     John's roommate, R.S., came home and went to the bathroom where John asked him for assistance in getting Jane away from him.

52.     Jane continued to ask John why he was so "weird" and why he liked M.F.

53.     Jane was jealous that John obviously liked M.F.

54.     John asked Jane to leave his apartment multiple times.

55.     R.S. asked Jane to leave the apartment as well.

56.     John had no physical contact with Jane at the apartment.

57.     Jane left the apartment.

58.     Jane returned to the apartment a few minutes later without invitation.

59.     John and R.S. agreed to go to their neighbor's apartment in an attempt to get away from Jane.

60.     Jane followed them for a minute, but she finally left.

61.     John had no further contact with Jane.

62.     The only person present at John's apartment who claims that any misconduct occurred is Jane.

63.     All other witnesses, including M.F., state that (1) there was no misconduct by John and (2) John and Jane were never alone long enough for any misconduct to occur.

64.     All witnesses, with the exception of Jane, consistently describe Jane as aggressive, insulting, and engaging in odd behavior.

8

65.     Kenyon forwarded a copy of its investigation summary to John on May 2, 2018.

66.     John responded on May 7, 2018, a full eight days prior to Kenyon's proposed date to provide its finding.

### Kenyon's Investigation of a Third-Party Report

67.     On May 8, 2018, just a week-and-a-half before graduation, Jane Roe 2 filed a report against John.

68.     Jane Roe 2 advised Kenyon that she did not want her report to be investigated.

69.     Kenyon opted to investigate Jane Roe 2's report based upon the premise that the report may constitute pattern evidence that should be included in the investigation of Jane's complaint against John.

70.     On May 9, 2018, Kenyon interviewed Jane Roe 2.  During the interview, Jane Roe 2 told investigators about events involving John that presented John in a negative light. Jane Roe 2 described the following:

a.   An incident when John put his hands around her shoulder and his hands touched her neck and he started "shaking [her] kind of."

b.   During the incident, Jane Roe 2 and her friend, E.D., observed John and he began yelling at Jane Roe 2 for not sleeping with him.

c.   An incident involving John and an unidentified female the last weekend of January when John acted inappropriately.

d.   Jane Roe 2 also alleged that John likes to grab "girls' asses."  She did not provide any other details to substantiate this claim.

9

71.     After speaking with Jane Roe 2, investigators also interviewed E.D. about Jane Roe 2's claims.  E.D. raised even more specious and tangential claims against John.  For instance, E.D. reported that John called a female student a "slut."

72.     On May 10, 2018, Kenyon provided John with the investigative summaries of interviews with Jane Roe 2 and E.D.  John had twenty-four hours to decide whether he wanted to respond the additional witnesses' claims and whether his response would be in writing or by means of an in-person interview.

73.     On May 11, 2018, John submitted a written rebuttal to the claims of Jane Roe 2 and E.D.

74.     On May 11, 2018, after learning that John would be filing suit and requesting injunctive relief in order to participate in graduation ceremonies, Kenyon informed John that its proposed decision date would be May 18, 2018 – the day prior to the graduation ceremony.

75.     The following day, Saturday, May 12, 2018, Kenyon emailed John two additional interview summaries and notified him that he had until close of business on Monday, May 14, 2018 to respond to the new evidence.  One interview summary consisted of a third interview of Jane.  The other interview summary consisted of an interview with S.G., who was a SMA on call the weekend of the alleged events in November 2017.

76.     In the span of seventy-two hours, John received multiple additional witness statements containing false claims against him that far exceeded the scope of any information relevant to the claims of Jane, the only reporting party who requested an investigation.

77.     On May 15, 2018, Kenyon emailed John campus safety reports from April 2017 containing a third-party report about John's ex-girlfriend who had personally declined to file a

report or complaint against John. Again, Kenyon notified John that if he wanted to respond, he had had until the close of business the following day.

### Kenyon's Title IX Policy

78.     In the fall of 2014, John matriculated as a freshman at Kenyon.  Upon his enrollment, he received a copy of Kenyon's Student Handbook and its Title IX Policy.  (See Exhibit A).

79.     Kenyon's Title IX Policy establishes Kenyon's rights and responsibilities for students at Kenyon.

80.     John was given assurances that Kenyon would follow and comply with the numerous policies and procedures adopted and put forth by the school, including those enumerated in the Title IX Policy.

81.     The Title IX Policy prohibits a spectrum of behavior, including all forms of sexual and gender-based discrimination, harassment and violence. These behaviors are called Prohibit Conduct.

82.     The Title IX Policy contains the following definitions for types of Prohibit Conduct:

a.  Sexual harassment: "any unwelcome sexual advance, request for sexual favors, or other unwanted verbal or physical conduct of a sexual nature" when various factors outlined in the Policy are present. (*Id.* at 8).

b.  Sexual exploitation: "exposing one's genitals in non-consensual circumstances." (*Id.* at 10).

     c. Physical Harm and Intimidation: "threatening, or causing physical harm, written or verbal abuse or other conduct that threatens or endangers the health or safety of any person." (*Id.*)

     d. Harassment, Bullying or Cyberbullying: "repeated and/or severe aggressive behavior likely to intimidate, threaten, or intentionally hurt, control; or diminish another person." (*Id.* at 11).

83. In addition to proscribing certain conduct, the Title IX Policy outlines the procedures that Kenyon must follow when investigating and adjudicating claims of misconduct.

84. Kenyon has various Title IX reporting options for students.

85. A student can make a report and request that no formal action be taken. In that situation, Kenyon makes it clear that its ability "to respond may be limited."

86. Alternatively, a student may file a complaint. After an initial review of the complaint occurs, an investigation will commence.

87. Kenyon outlines many important expectations for students during the investigation of a complaint. Some of the most relevant to this matter are as follows:

     a. A prompt and equitable response to reports of Prohibited Conduct.

     b. The opportunity for an advisor of choice who may attend all meetings and proceedings related to the assessment, investigation, or resolution of the report.

     c. Prompt remedial action if Prohibited Conduct is determined to have occurred.

     d. Regular communication about the progress of the process and of the resolution.

e.  Timely written notice of the outcome, and sanctions, and the rationale for each.

f.  The opportunity to appeal the outcome (determination as to responsibility) and sanction; and

g.  To be free from retaliation, harassment, or intimidation.

(*Id.* at 17).

88.  The Title IX Policy explains that witnesses interviewed during an investigation "must have observed the acts in question or have information relevant to the incident and cannot be participating solely to speak about an individual's character." (*Id.* at 21).

89.  According to the Title IX Policy, in gathering the facts, "the investigators may consider similar prior or subsequent reports of, or findings of responsibility for, similar conduct by the respondent to the extent such information is relevant.  The determination of relevance for pattern evidence will be based on an assessment of whether the previous or subsequent conduct was substantially similar to the conduct under investigation or indicates a pattern of similar Prohibited Conduct.  Prior or subsequent conduct of the respondent may also be considered in determining other relevant issues, including knowledge, intent, motive or absence of mistake." (*Id.*).

90.  The Title IX Policy explains that "the sexual history of the complainant and respondent will never be used to prove character or reputation." (*Id.*).

91.  While any party may introduce pattern evidence, "the Title IX Coordinator has the discretion to make the final determination whether evidence of prior sexual history or other misconduct is relevant to the determination regarding responsibility." (*Id.* at 21-22).

13

92.     Although parties may be supported by an advisor of his or her own choosing, the advisor is a "silent and non-participating presence." (*Id.* at 19).

93.     Upon completion of the investigation, the investigators make a determination, by a preponderance of the evidence, whether there is a violation of the Title IX Policy. (*Id.* at 22).

94.     If there is a finding of responsibility, the matter is referred to an Adjudicator to determine the appropriate sanction. (*Id.*).

95.     An Adjudicator should consider a sanction that eliminates Prohibited Conduct, prohibits recurrence, and supports the college's obligations. (*Id.* at 23).

96.     Examples of possible sanctions for prohibited conduct include the following: Statement of Concern, Warning, Suspension, and Dismissal. (*Id.* at 24).

97.     A complainant and respondent may each appeal the outcome of the matter. A written appeal must be submitted within five business days of receipt of the Notice of Outcome. (*Id.* at 25).

98.     Appeals may be made only on the basis of (1) a procedural error that materially affected the outcome, (2) new information unavailable at the original proceeding, or (3) the decision of the investigators and/or Adjudicator was clearly erroneous based on the evidential record. (*Id.*).

99.     An Appeals Officer will make a decision within ten business days of receipt of all appeal documents. (*Id.*).

**Anti-Male Gender Bias Triggered Violations of
John's Rights Under Kenyon's Title IX Policy**

100.    Kenyon's violations of John's rights under the Title IX Policy were motivated by animus towards male students which is detailed in party in the direct and Indirect Evidence of Gender Bias[1] detailed in the Complaint.

101.    Upon information and belief, widespread anti-male bias exists at Kenyon in part because of an April 11, 2011 "Dear Colleague" letter issued by the United States Department of Education's ("DOE") Office for Civil Rights ("OCR") which instructed how colleges must investigate and resolve complaints of sexual misconduct under Title IX. ("2011 Dear Colleague Letter" available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-2011o4.html). This letter manifests Indirect Evidence of Gender Bias in part by equating complainants in sexual misconduct proceedings to females who must receive preferential treatment. For instance, the 2011 Dear Colleague Letter:

  a.  Incorrectly[2] states: "1 in 5 *women* are victims of completed or attempted sexual assault while in college…[t]he department is deeply concerned about this problem…" 2011 Dear Colleague Letter, p.2 (emphasis added);

  b.  Warns that "the majority of sexual assaults occur when women are incapacitated, primarily by alcohol." *Id.*

  c.  Suggests educations institutions seek grants from the U.S. Department of Justice's Office on Violence against Women which require institutions to "develop victim

---

[1] The term "Indirect Evidence of Gender Bias" as used in this Complaint refers to statements from which the following inferences can be drawn: (1) a primary advocacy on behalf of females who allege males engaged in sexual misconduct; (2) minimal or no advocacy on behalf of males who are alleged to have engaged in sexual misconduct towards females; and/or (3) minimal or no advocacy for protecting males from sexual misconduct perpetrated by females.

[2] As discussed in this Complaint, Kenyon and the OCR often repeated allegation that "1 in 4" or "1 in 5" female college students are sexually assaulted is unsupported. For example, a report issued by The American Association of University Women noted that over 90% of the colleges and universities in the United States reported that none of their students were raped in 2014. *See*, American Association of University Women, *91 Percent of Colleges Reported Zero Instances of Rape in 2014* (Nov. 23, 2015). In addition, academics conducting a research study found that approximately 50% of sexual assault allegations at two Midwestern American colleges were false. *See, Eugene J. Kanin, False Rape Allegations,* Archives of Sexual Behavior, Vol. 23, No.1 (1994).

service programs and campus policies that ensure victim safety, [and] offender accountability…" *Id.* at 19.;

    d. Warns education institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs." In fact, OCR asks "schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs. *Id.* at 15.; and

    e. Requires educational institutions "minimize the burden on the complainant." *Id.*

102. The 2011 Dear Colleague Letter also manifests Indirect Evidence of Gender Bias by making it more difficult for males accused of sexual misconduct to defend themselves. For example, the letter required schools to adopt the lowest burden of proof – "more likely than not" – in cases alleging sexual misconduct. Several colleges had been using the "clear and convincing evidence" standard and some, Stanford University for example, applied the criminal standard of "beyond a reasonable doubt."

103. Similarly, on April 29, 2014, OCR published a document titled "Questions and Answers on Title IX and Sexual Violence" (available at http://www2.ed.gov/about/offices/list/ocr/docs/qa-2014-titleix.pdf). This OCR directive manifests Indirect Evidence of Gender Bias in part because it hampered the accused student's ability to defend himself by reducing or eliminating the ability to expose credibility flaws in the allegations made against him. For example, OCR's 2014 Q&A states schools:

    a. "[M]ust not require a complainant to be present" at disciplinary hearings. OCR's 2014 Q&A, p.30; and

    b. May decide to eliminate all opportunities for "cross examination." *Id.* at 31.

104. Many academics and authors have raised alarms that DOE/OCR's worthwhile goal of protecting college students from sexual misconduct has evolved into an unlawful example of federal governmental overreach that violates the rights of male students who never

16

engaged in misconduct. *See e.g.,* Emily D. Safko, *Are Campus Sexual Assault Tribunals Fair?:. The Need For Judicial Review and Additional Due Process Protections In Light of New Case Law,* 84 Fordham L. Rev. 2289 (2016), pgs. 2304-5.

105.    OCR put incredible pressure on colleges by putting millions of dollars of federal aid at risk.  DOE/OCR can impose civil penalties and/or suspend institutions from participating in federal student financial aid programs if DOE/OCR finds colleges, such as Kenyon, did not do enough to discipline males alleged to have engaged in sexual misconduct.

106.    In September 2016, OCR launched an investigation of Kenyon College for its implementation of its Title IX Policy. This investigation is OCR Docket # 15-16-2149.

107.    To remediate some of the effects of the 2011 Dear Colleague Letter and the 2014 Q&A, OCR issued new interim guidance in the form of a 2017 Dear Colleague Letter dated September 22, 2017.  The 2017 Dear Colleague Letter makes clear that school are no longer required to use the preponderance of the evidence burden of proof.

108.    Upon information and belief, Kenyon institutionalized OCR's Indirect Evidence of Gender Bias into Kenyon's Title IX Policy.

109.    Kenyon's Title IX Policy does not afford male students accused of sexual misconduct due process.

110.    Kenyon male students accused of sexual misconduct are not permitted to communicate with the college through counsel.

111.    Kenyon male students accused of sexual misconduct are not permitted to examine their accuser or witnesses.

112.    Kenyon male students accused of sexual misconduct are not permitted to be present when investigators examine the accuser and/or witnesses.

17

113.    Kenyon male students accused of sexual misconduct are not afforded a hearing.

114.    Kenyon male students have more rights when charged with a traffic citation (even a civil traffic camera citation) than when charged with sexual misconduct by a female student at Kenyon.

115.    Kenyon has been subject to national ridicule for allegedly ignoring the rape of a student. *See, http://www.newsweek.com/michael-hayes-kenyon-letter-sexual-assault-461704.*

116.    Upon information and believe, due to that bad publicity, in addition to the pending OCR investigation of Kenyon, Kenyon has engaged in Indirect Gender Bias against male students accused of sexual misconduct.

117.    Upon information and belief, Kenyon's unreasonable investigation of John occurred and is occurring in part because of Kenyon's archaic presumption that female students do not engage in sexual misconduct against their fellow male students (e.g. Kenyon ignoring that Jane barged into a bathroom and positioned herself in order to view John's genitals). Evidence supporting this belief includes, but is not limited to, Kenyon's: (a) unreasonable rejection of the evidence showing John did not engage in misconduct; (b) decision to ignore the glaring inconsistencies in Jane's statements; (c) decision to enact the Title IX Policy that does not afford male students accused of sexual misconduct standard due process; and (d) decision to extend its investigation in order to ensure that John does not participate in his graduation ceremony.

118.    Upon information and belief, Kenyon has disciplined far more male students for sexual misconduct than female students.

119.    Kenyon's direct and Indirect Evidence of Gender Bias has created a hostile environment which in turn creates an adverse educational setting in violation of Title IX in part because Kenyon engages in sexual stereotyping discrimination based on unlawful notions of

masculinity and femininity. This hostile environment causes innocent males on Kenyon's campus to be unlawfully disciplined and interferes with their ability to participate in or benefit from various activities including learning on campus.

120. Although Kenyon may contend that the Title IX Policy is gender neutral, this position is a pretext for direct and Indirect Gender Bias.

121. Kenyon's Title IX process has been fundamentally unfair, unreasonable, and intended to placate Jane. Kenyon violated John's rights through the following actions:

    a. Imposing a No Contact Order between John and Jane without allowing John to see the complaint against him and without speaking to him first;

    b. Expanding the scope of the investigation into a report made by Jane Roe 2;

    c. Expanding the scope of the investigation to include a third-party safety report involving John's ex-girlfriend who is uninvolved in anything and did not file a report or complaint against John;

    d. Imposing a No Contact Order between John and Jane Roe 2 without allowing John to see her report and without speaking to him first;

    e. Denying John the right to confront his accusers;

    f. Expanding the scope of the investigation to include matters Kenyon inappropriately deems possible pattern evidence;

    g. Interviewing witnesses who do not comport with the parameters outlined in the Title IX Policy;

    h. Considering John's prior sexual history; and

    i. Denying John the right to appeal any outcome prior to his graduation.

**Plaintiff Will Suffer Immediate and Irreparable Harm Absent Injunctive Relief**

122.    John is a senior at Kenyon and has completed all requirements necessary to graduate.

123.    John is schedule to graduate with his class on May 19, 2018.

124.    John's family is scheduled to attend his graduation ceremony to celebrate his accomplishment.

125.    If John is not permitted to participate in graduation with his class there will be no adequate remedy to compensate him for that loss.

126.    An injunction is necessary to ensure that John does not lose the once in a lifetime opportunity to participate with his class in Kenyon's graduation ceremony.

**CAUSES OF ACTION**

**Count I**
**Defamation Per Se**
(Against Jane)

127.    Plaintiff repeats and incorporates all the preceding allegations of this Complaint, as if fully set forth herein.

128.    Jane knew and intended her Non-Privileged Defamation to be heard and/or read by persons in the State of Ohio and intended her Non-Privileged Defamation to damage John's personal reputation.

129.    Jane made her Non-Privileged Defamation with actual malice and reckless disregard of the falsity of her statements.

130.    As a direct and proximate result of Jane's Non-Privileged Defamation, John suffered and will continue to suffer damages.

20

**Count II**
**Defamation Per Quod**
(Against Jane)

131.   Plaintiff repeats and incorporates all the preceding allegations of this Complaint, as if fully set forth herein.

132.   Jane knew and intended her Non-Privileged Defamation to be heard and/or read by persons in the State of Ohio and intended said Defamation to damage John's reputation.

133.   Jane's Non-Privileged Defamation was made with actual malice and reckless disregard of their falsity and knowledge of their falsity.

134.   As a direct and proximate result of Jane's Non-Privileged Defamation, John suffered and will continue to suffer damages.

Wherefore, with regard to Counts 1-2, John demands judgment against Jane as follows:

(a) For actual, special, and compensatory damages, along with reasonable attorney fees, in an amount to be determined at trial but in no event less than $75,000.00;

(b) For punitive damages in an amount sufficient to deter Jane from engaging in similar conduct;

(c) Judgment for attorney fees;

(d) Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

(e) Pre-judgment interest and post-judgment interest as may be permitted by law and statute; and/or

(f) Such other further relief as this Court finds just and equitable.

21

**Count III**
**Breach of Contract**
(Against Kenyon)

135.　Plaintiff repeats and incorporates all the preceding allegations of this Complaint, as if fully set forth herein.

136.　John applied for and enrolled at Kenyon and, with the assistance of his parents, paid tuition and other fees and expenses. John did so in reliance on the understanding, and with the reasonable expectations, among others, that: (a) Kenyon would implement and enforce the Student Handbook and Title IX Policy, and (b) the Student Handbook and Title IX Policy would comport with the requirements of applicable law.

137.　The Student Handbook and Title IX Policy create an express contract, or, alternatively, a contract implied in law or in fact between John and Kenyon.

138.　Kenyon repeatedly and materially breached its policies and John's rights under its Title IX Policy.

139.　During all times relevant to this Complaint, John did all, or substantially all, of the significant things Kenyon required of him. All of the foregoing breaches of contract were wrongful, without lawful justification or excuse, prejudicial, and were part of an effort to achieve a predetermined result in connection with Jane's complaint.

140.　As a direct and proximate result of Kenyon's breach of contract, John has sustained damages.

　　　　Wherefore, with regard to Count 3, John demands judgment against Kenyon as follows:

　　　　　　　　(a) For actual, special, and compensatory damages, along with reasonable attorney fees, in an amount to be determined at trial but in no event less than $75,000.00;

22

(b) Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

(c) Pre-judgment interest and post-judgment interest as may be permitted by law and statute; and/or

(d) Such other further relief as this Court finds just and equitable.

**Count IV**
**Violation of Title IX – Hostile Environment / Sexual Discrimination**
(Against Kenyon)

141.    Plaintiff repeats and incorporates all the preceding allegations of this Complaint, as if fully set forth herein.

142.    Pursuant to 20 U.S.C. § 1681, Title IX is a federal statute designed to prevent sexual discrimination in educational institutions that receive federal funding.

143.    Kenyon received federal funding and Title IX applies to Kenyon College.

144.    Title IX includes an implied private right of action without any requirement that administrative remedies be exhausted.  An aggrieved party may seek monetary damages and other relief.

145.    Title IX mandates that Kenyon afford equitable procedures to John.  Such procedures include, but are not limited to, those detailed in the complaint.

146.    Kenyon knew, or should have known, that its delayed investigative procedures involving John, including ignoring the cumulative evidence of actual innocence, would create a hostile environment for John.

147.    Kenyon's Title IX Policy fails to meet the standards required by Title IX and/or as interpreted by courts in connection with how institutions of higher education conduct disciplinary proceedings.

148. Upon information and belief, in virtually all cases of campus sexual misconduct at Kenyon, the accused student is male and the accusing student is female.

149. Kenyon created an environment in which male students accused of sexual misconduct, such as John, are fundamentally denied their rights under Title IX and/or Kenyon's Title IX Policy and Student Handbook so as to be virtually assured of a finding of responsibility. This biased and one-sided process deprives male Kenyon students of educational opportunities based upon their gender.

150. Kenyon had actual or constructive knowledge that its investigation of John posed a persuasive and unreasonable risk of gender discrimination with regard to John.

151. Kenyon's actions or inactions set in motion a series of events that Kenyon knew would cause Kenyon's male students, including John, to suffer unlawful gender discrimination.

152. Kenyon's investigation of John is discriminatory and is based upon his gender.

153. Kenyon's deliberate indifference caused John to suffer discrimination based upon his gender.

154. Upon information and belief, Kenyon possesses additional information evidencing its unlawful pattern of gender biased decision making that provides preferential treatment to females who accuse males of sexual misconduct.

155. As a direct result of Kenyon's violations of John's rights under Title IX and/or the Title IX Policy and Student Handbook, John has suffered and will continue to suffer damages.

156. John has been damages in an amount to be determined at trial.

**Count V**
**Violation of Title IX – Selective Enforcement**
(Against Kenyon)

157.    Plaintiff repeats and incorporates all the preceding allegations of this Complaint, as if fully set forth herein.

158.    Kenyon engages in the selective enforcement of Title IX and the Title IX Policy based upon a student's gender.

159.    Kenyon's decision to continue its investigation of John despite obvious evidence of actual innocence was based upon John's gender.

160.    Kenyon's selective enforcement has caused John to suffer and continue to suffer damages.

Wherefore, with regard to Count 4-5, John demands judgment against Kenyon as follows:

(a) Damages in an amount to be determined at trial but in no event less than $75,000.00;

(b) Orders requiring Kenyon to expunge John's official Kenyon file of all information relating to his interactions with Jane and Jane Roe 2;

(c) An order requiring Kenyon to permit John to participate in graduation ceremony and to permit him to graduate from the college;

(d) Judgment for attorney fees;

(e) Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

(f) Pre-judgment interest and post-judgment interest as may be permitted by law and statute; and/or

(g) Such other further relief as this Court finds just and equitable.

**Count VI**
**Intentional Infliction of Emotional Distress**
(Against Kenyon and Jane)

161.   Plaintiff repeats and incorporates all the preceding allegations of this Complaint, as if fully set forth herein.

162.   The conduct of Kenyon and Jane, as described above, was extreme, outrageous, and beyond the scope of common decency and was intended to cause John severe emotional distress.

163.   Kenyon and Jane intended to cause John serious emotional distress by making false allegations that he committed sexual misconduct.

164.   As a direct and proximate result of Kenyon's and Jane's conduct, John has suffered serious emotional distress which no reasonable person should be expected to endure.

165.   John has suffered serious emotional distress as a result of Kenyon's and Jane's conduct.

Wherefore, with regard to Count 6, John demands judgment against Jane as follows:

(a) For actual, special, and compensatory damages, including John's legal fees, in an amount to be determined at trial but in no event less than $75,000.00;

(b) For punitive damages in an amount sufficient to deter Jane from conducting similar future conduct but in no event less than $100,000;

(c) Judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action;

(d) Pre-judgment interest and post-judgment interest as may be permitted by law and statute; and/or

(e) Such other further relief as this Court finds just and equitable

26

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

*/s/ Susan C. Stone*
Susan C. Stone (0064445)
Kristina W. Supler (0080609)
MCCARTHY, LEBIT, CRYSTAL & LIFFMAN CO., LPA
101 W. Prospect Ave., Suite 1800
Cleveland, OH 44115
P: (216) 696-1422
F: (216) 696-1210
E: scs@mccarthylebit.com
    kws@mccarthylebit.com

*Attorneys for Plaintiff*